UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KATHERINE DEW,

               Plaintiff,                 Case No. 2:15-cv-12660
                                               District Judge Mark Goldsmith
v.                                   Magistrate Judge Anthony P. Patti

COMMISSIONER OF
SOCIAL SECURITY,

               Defendant.
_____/

## RECOMMENDATION TO GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DE 20) AND TO DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DE 19)

**I.**    **RECOMMENDATION**: For the reasons that follow, it is

**RECOMMENDED** that the Court **GRANT** Defendant's motion for summary

judgment (DE 20), **DENY** Plaintiff's motion for summary judgment (DE 19), and

**AFFIRM** the Commissioner's decision.

**II.**    **REPORT**

Plaintiff, Katherine Dew, brings this action under 42 U.S.C. §§ 405(g) and

1383(c)(3) for review of a final decision of the Commissioner of Social Security

("Commissioner") denying her application for social security disability insurance

benefits.  This matter is before the United States Magistrate Judge for a Report and

Recommendation on Plaintiff's motion for summary judgment (DE 19), the

Commissioner's memorandum in opposition and cross motion for summary judgment (DE 20), and the administrative record (DE 15).

## A.    Background

Plaintiff filed her application for disability insurance benefits and for Supplemental Security Income ("SSI") on March 22, 2013, alleging that she has been disabled since November 10, 2010.  (R. at 164-173.)  Plaintiff later amended her onset date to March 1, 2013 "so there's no issue or concern regarding the unemployment benefits."  (R. at 26.)  Both of Plaintiff's applications were denied (R. at 107-115) and she sought a *de novo* hearing before an Administrative Law Judge ("ALJ").  (R. at 116-119.)  ALJ Patrick MacLean held a hearing on December 9, 2013.  (R. at 24-62.)  On February 14, 2014, the ALJ issued an opinion which found Plaintiff to not be disabled.  (R. at 8-19.)  In May 2015, the Appeals Council denied Plaintiff's request for review.  (R. at 1-3.)  ALJ MacLean's decision became the Commissioner's final decision.  Plaintiff then timely commenced the instant action.

## B.    Plaintiff's Medical History

The record of Plaintiff's medical and mental health treatment is nearly 500 pages long.  (R. 258-739.)  Thus, the Court thus will discuss only the most pertinent portions in this Report and Recommendation.

In her July 2012 disability report, Plaintiff listed the physical conditions which prevented her from working as "heart problems[,]" including an irregular heartbeat, high blood pressure, high cholesterol and "icd in chest[.]"[1] (R. at 202.) In that same report, Plaintiff listed the mental conditions which prevented her from working as severe depression, anxiety and stress. (*Id.*)

In December 2013, Plaintiff's treating cardiologist, Douglas Weaver, M.D., filled out a "cardiac medical source statement[.]" (R. at 733-736) (capitalization standardized). Therein Dr. Weaver stated that he had treated Plaintiff since June 2011 for "non-ischemic cardiomyopathy." (R. at 733.) Dr. Weaver opined that Plaintiff's condition was stable but "unlikely to improve[.]" (*Id.*) Dr. Weaver checked boxes indicating that Plaintiff's "signs and symptoms" were chest pain, weakness, exertional dyspnea,[2] loss of appetite, exercise intolerance, chronic fatigue and nausea. (*Id.*) Later in the report Dr. Weaver checked a box indicating that he believed Plaintiff to be incapable of even low stress work. (R. at 734.) Dr.

---

[1] An ICD is an implantable cardioverter defibrillator, which the American Heart Association describes as "a battery-powered device placed under the skin that keeps track of your heart rate. Thin wires connect the ICD to your heart. If an abnormal heart rhythm is detected the device will deliver an electric shock to restore a normal heartbeat if your heart is beating chaotically and much too fast." http://www.heart.org/HEARTORG/Conditions/Arrhythmia/PreventionTreatmentof Arrhythmia/Implantable-Cardioverter-Defibrillator-ICD_UCM_448478_Article.jsp#.WBn1P9UrKM8 (last visited November 8, 2016).

[2] Dyspnea is defined as "difficult or labored respiration[.]" http://www.merriam-webster.com/dictionary/dyspnea (last visited November 8, 2016).

Weaver listed Plaintiff as being able to (during an eight-hour workday): walk one-half of a block without rest; stand/walk less than two hours; and sit at least six hours.  (*Id.*)  Dr. Weaver wrote "unable to work" in response to a question about whether Plaintiff required a job that would allow her to change at will from a sitting to a standing position.  (*Id.*)   Finally, Dr. Weaver checked boxes indicating that he believed Plaintiff would be off task 25% or more of a normal workday and would miss more than four work days per month, though he did not explain how or why he arrived at those conclusions.  (R. at 736.)

Joyce Anderson, a social worker, also filled out a medical source statement in December 2013 which focused on Plaintiff's mental health.  (R. at 737-739.)  Ms. Anderson checked boxes indicating that Plaintiff had moderate limitations regarding her ability to:  understand and remember simple instructions, carry out simple instructions, carry out complex instructions and make judgements on complex work-related decisions; Ms. Anderson checked boxes indicating that Plaintiff had marked restrictions on her ability to make judgments on simple work-related decisions and to understand and remember complex instructions.  (R. at 737.)[3]

---

[3] Plaintiff's motion does not explicitly discuss Ms. Anderson's statement.  In addition, "[a]ccording to Social Security Ruling 06–03p, even a licensed clinical social worker is not an acceptable medical source, and this designation may justify giving an opinion of an acceptable medical source greater weight."  *Miller v.*

Also, in September 2012, state agency physician Michael Parish, M.D. reviewed the medical record.  (R. at 83-94.)  Dr. Parish opined that Plaintiff's chronic heart failure was a primary severe impairment and a condition called "Affective Disorders" was Plaintiff's secondary severe impairment.  (R. at 87.) Dr. Parish concluded that Plaintiff could perform sedentary work and, consequently, was not disabled.  (R. at 93.)  State agency reviewer James Tripp, Ed. D., also completed a mental residual functional capacity ("RFC")[4] assessment after reviewing Plaintiff's records and concluded Plaintiff "is able to perform simple, unskilled work and interact with others adequately."  (R. at 90-92) (capitalization standardized).

### C.    Hearing Testimony

#### 1.    Plaintiff's Testimony

At the December 9, 2013 hearing before the ALJ, Plaintiff reported that she was twenty-nine years old (R. at 30), five feet three inches tall and weighed 290 pounds.  (R. at 32.)  Plaintiff testified that she did her own laundry and cooking, picked up around the house, vacuumed, did dishes and took care of her dog—

_____

*Comm'r of Soc. Sec.*, 811 F.3d 825, 838 n.9 (6th Cir. 2016) (quotation marks omitted).

[4] A claimant's "residual functional capacity" is an assessment of the most he or she can do in a work setting despite his or her physical or mental limitations.  20 C.F.R. §404.1545(a); *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002).

including taking it on some walks and bathing it.  (R. at 33-34.)  Plaintiff has a driver's license and drives short distances about once a week, but her father drives her to shop for groceries.  (R. at 35-36.)  When asked about her hobbies, Plaintiff stated she likes to crochet, look at things on the computer and watch television.  (R. at 37.)  However, Plaintiff later testified that she had not crocheted in six months.  (R. at 38-39.)

Plaintiff stated that she had a defibrillator installed in February 2012 and since that time had "felt the pacemaker kick in once or twice."  (R. at 39-40.)  She also testified that her left arm had been weak and sore since the defibrillator was installed.  (R. at 40.)  Plaintiff was able to take care of her personal needs, such as showering, but it takes her a long time to do so because she gets winded easily.  (R. at 41.)  When asked about her sleep, Plaintiff stated she has nightmares and sleeps poorly.  (*Id.*)

The ALJ then inquired about Plaintiff's mental health treatment.  Plaintiff stated that the treatment, including taking several medications, helped her depression, though it had not helped her anxiety or sleep issues as much.  (R. at 42.) Plaintiff reported having two to three panic attacks per week.  (R. at 42-43.)

The ALJ then inquired as to Plaintiff's heart medications, and Plaintiff mentioned several.  (R. at 43.)  However, Plaintiff stated the medications make her,

among other things, dizzy and sleepy.  (R. at 43.)[5]  Plaintiff related that she dozed

off if she sat down and she could stand only ten to fifteen minutes before becoming

dizzy.  (R. at 44-45.)  Plaintiff reported being able to walk about two blocks if

allowed to proceed at her own pace but only about one block if required to walk

quickly.  (R. at 45.)   Plaintiff stated a gallon of milk was the most she could carry.

(R. at 46.)  In addition, Plaintiff described herself as being forgetful and preferring

to "shy away" from others.  (R. at 46-47.)

## 2.    Vocational Expert Testimony

Lawrence Zatkin also testified at the hearing as a Vocational Expert ("VE").

(R. at 53-62.)  After discussing with the VE Plaintiff's previous work as a

doughnut maker (light or medium and semi-skilled), stock worker (medium and

unskilled) and counter clerk (light pursuant to Dictionary of Occupational Titles

("DOT") but heavy as performed by Plaintiff and semi-skilled) (R. at 53-58), the

ALJ asked the following lengthy hypothetical question:

> I would ask you to assume a person of claimant's age, education,
> work experience, and skill set who is able to lift up to 10 pounds
> occasionally and [perform] sedentary work as defined by the
> regulations; standing or walking for approximately two hours per
> eight-hour work day; and sitting for approximately six hours per
> eight-hour work day with normal breaks; no climbing ladders, ropes,
> or scaffolds; occasionally climb ramps or stairs; occasionally balance,
> stoop, crouch, kneel, and crawl.  Work would be limited to simple,
> routine, and repetitive tasks; only occasional interaction with the
> public and coworkers.  Can an individual with these limitations

---

[5] Plaintiff listed similar side effects from her mental health medications.  (R. at 43.)

perform claimant's past relevant work as claimant performed it or as
customarily performed?

(R. at 58) (paragraph breaks omitted).  The VE answered "[n]o[,]" explaining that

the person described in the hypothetical was limited to unskilled, sedentary work

whereas Plaintiff's prior work involved greater exertional and skill levels.  (R. at

58-59.)

The ALJ then asked if there were available jobs in the national economy for

the person described in the hypothetical, and the VE responded that such a person

could work as: a sorter (1,200 positions in Michigan and 30,000 nationally); a table

worker (4,000 positions in Michigan and 50,000 to 60,000 nationwide); and a

weight tester (also 4,000 positions in Michigan and 50,000 to 60,000 nationwide).

(R. at 59.)   The VE then responded to a question from the ALJ by stating that

there were no jobs available for a person who would be off task more than twenty

percent of an eight-hour workday.  (*Id.*).

### D.  THE ADMINISTRATIVE DECISION

On February 14, 2014, the ALJ issued his decision.  (R. at 8-19.)  At Step 1

of the sequential evaluation process,[6] the ALJ found that Plaintiff had not engaged

---

[6] Social Security Regulations require ALJs to resolve a disability claim through a
five-step sequential evaluation of the evidence.  *See* 20 C.F.R. §404.1520(a)(4).
Although a dispositive finding at any step terminates the ALJ's review, *see Colvin
v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered the sequential
review considers and answers five questions:

in substantial gainful activity since her alleged onset date of March 1, 2013.  (R. at

13.)  At Step 2, the ALJ found that Plaintiff had the following severe impairments:

cardiomyopathy; obesity; major depressive disorder; generalized anxiety disorder;

panic disorder without agoraphobia; borderline personality disorder; and

status/post ICD placement.   (*Id.*)  At Step 3, the ALJ found that Plaintiff did not

have an impairment or combination of impairments that met or medically equaled

one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix

1.  (R. at 14.)

Prior to undertaking Step 4, the ALJ evaluated Plaintiff's RFC and

determined that she had the capacity to perform sedentary work[7] "except she

---

1.    Is the claimant engaged in substantial gainful activity?
2.    Does the claimant suffer from one or more severe impairments?
3.    Do the claimant's severe impairments, alone or in combination, meet
      or equal the criteria of an impairment set forth in the Commissioner's
      Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1?
4.    Considering the claimant's residual functional capacity, can the
      claimant perform his or her past relevant work?
5.    Considering the claimant's age, education, past work experience, and
      residual functional capacity, can the claimant perform other work
      available in the national economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th
Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

[7] Sedentary work "involves lifting no more than 10 pounds at a time and
occasionally lifting or carrying articles like docket files, ledgers, and small tools.
Although a sedentary job is defined as one which involves sitting, a certain amount
of walking and standing is often necessary in carrying out job duties. Jobs are

cannot climb ladders, ropes or scaffolds.  She can occasionally kneel, crouch and crawl.  She can perform simple, routine tasks." (R. at 15) (emphasis omitted).  The ALJ then concluded at Step 4 that Plaintiff could not perform any relevant past work.  (R. at 17-18.)

At Step 5, the ALJ concluded that Plaintiff was capable of performing other jobs that exist in significant numbers in the national economy.  (R. at 18-19.)  Specifically, the ALJ determined that Plaintiff could work as a sorter, table worker and weight tester.  (*Id.*)  The ALJ therefore concluded that Plaintiff was not disabled under the Social Security Act.  (R. at 19.)

### E.  STANDARD OF REVIEW

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence

---

sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. §404.1567(a).

but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant."). Furthermore, the claimant "has the ultimate burden to establish an entitlement to benefits by proving the existence of a disability." *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of

Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").   Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"   *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## F.  ANALYSIS

In her motion for summary judgment, Plaintiff raises three main issues. First, she asserts that the ALJ failed to give controlling weight to the opinion of Dr. Weaver.  (DE 19 at 5.) Second, she contends the ALJ's RFC does not accurately portray her physical and mental limitations.  (*Id.*).  Finally, she argues that the ALJ failed to evaluate properly Listing 4.02.  (*Id.*)[8]  The Commissioner opposes Plaintiff's motion, asserting that she is entitled to summary judgment because substantial evidence supports the ALJ's conclusions.  I agree with the Commissioner.

### 1.  The Weight Given to Dr. Weaver's Opinion[9]

---

[8] Though Plaintiff's motion refers to Listing 1.04A on page five in her list of issues presented, the discussion section focuses on Listing 4.02.  (*See* DE 19 at 17-20.) The Court thus presumes the reference to Listing 1.04A is a scrivener's error.

[9] Though Plaintiff uses the plural "treating sources" from time to time in her brief, Dr. Weaver is the only treating source whose opinion is specifically discussed therein.

Plaintiff contends that the ALJ "points to no substantial evidence in the record to dispute the treating cardiologist Dr. W. Douglas Weaver, MD['s], medical opinion" and that "Dr. Weaver is devoted one paragraph in the decision where the ALJ summarizes and dismisses Dr. Weaver's medical opinion without any discussion of his findings or medical opinion." (DE 19 at 11.) Plaintiff later hyperbolically asserts that "[t]here were no reasons whatsoever that the ALJ gave for discounting Dr. Weaver's medical opinion, let alone 'good reasons' . . . ." (*Id.* at 13.)

The portion of the ALJ's opinion at issue is the following paragraph:

> On August 8, 2013, the claimant's treating cardiologist submitted a statement regarding the claimant's residual functional capacity. The doctor concluded that the claimant could walk for ½ hour before resting, stand/walk for less than 2 hours, sit for at least six hours, take frequent unscheduled breaks and be off task 25% or more during the day. The doctor also concluded that the claimant can frequently lift/carry less than 10 pounds and occasionally, [sic] 10 pounds. She can never stoop, crouch/squat, or climb ladders. She can rarely twist and climb stairs. I give *some weight* to the doctor's opinion, but only with respect to the finding that the claimant could perform sedentary work. The claimant's obesity combined with her heart condition, though stable, and [sic] produces limitations that relegate her to the sedentary level of exertion. However, I give no weight to the finding that she would need to be off task or take frequent unscheduled breaks, as those limitations are not supported by the record. In fact, the claimant's reported activities of daily living exceed the doctor's conclusions regarding her physical limitations.

(R. at 16) (emphasis added). Plaintiff argues that "it is unclear what weight the ALJ give [sic] to Dr. Weaver and the reasons for the weight given." (DE 19 at 12.)

13

As the block quoted paragraph demonstrates, the degree of weight is clear, and as explained below, the reasons for the weight are also quite apparent.

### a.  The Treating Source Rule

The ALJ generally gives deference to the opinions of a treating source "since these are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone . . . ." 20 C.F.R. § 416.927(d)(2); *Blakley*, 581 F.3d at 408. To qualify as a treating source, the physician must have an "ongoing treatment relationship" with the claimant. 20 C.F.R. § 404.1502.

If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must meet certain procedural requirements.[10] *Wilson v. Comm'r*

---

[10] An exception exists for treating source opinions on issues that are reserved to the Commissioner, which "are never entitled to controlling weight or special significance." Social Security Ruling ("SSR") 96-5p, 1996 WL 374183, at *1 (July 2, 1996). Examples of issues reserved to the Commissioner include:

    1. Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;
    2. What an individual's RFC is;
    3. Whether an individual's RFC prevents him or her from doing past relevant work;
    4. How the vocational factors of age, education, and work experience apply; and
    5. Whether an individual is "disabled" under the Act.

*Id*. at *2.

*of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). Specifically, if an ALJ does not give a treating source's opinion controlling weight:

> an ALJ must apply certain factors—namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source—in determining what weight to give the opinion.

*Id.* Furthermore, an ALJ must "always give good reasons in [the] notice of determination or decision for the weight [the ALJ] give[s] your treating source's opinion." 20 C.F.R. § 416.927(d)(2).  Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Friend v. Comm'r of Soc. Sec.*, 375 Fed. App'x 543, 550 (6th Cir. 2010) (internal quotation omitted).

The United States Court of Appeals for the Sixth Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule. *See Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544-45.  Thus, the reason-giving requirement is "particularly important when the treating physician has diagnosed the claimant as disabled." *Germany-Johnson v. Comm'r of Soc. Sec.*, 313 Fed. App'x 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242).

### b.  Harmless Error as to How Far Plaintiff Can Walk

The Commissioner does not dispute that Dr. Weaver is a treating physician. It is also clear that the ALJ erred by stating that Dr. Weaver had opined that Plaintiff can walk half an hour before resting.  To the contrary, Dr. Weaver opined that Plaintiff could walk half a *block* before resting.  (*See* R. at 734.)  The question, however, is whether the ALJ's assessment of Dr. Weaver's opinion on the whole entitles Plaintiff to relief.  In other words, the ALJ's error in relating Dr. Weaver's opinion on Plaintiff's ability to walk is not, standing alone, a mistake of such magnitude as to automatically entitle Plaintiff to relief, especially as the ALJ concluded only that Plaintiff could perform sedentary work which, by its very definition, only requires occasional walking.  *See* 20 C.F.R. §404.1567(a).  As a final prefatory matter, it is also plain that Plaintiff's argument that the ALJ gave no reasons "whatsoever" for discounting Dr. Weaver's opinion (DE 19 at 13) is fallacious, since the ALJ expressly stated that the limitations imposed by Dr. Weaver are "not supported by the record" and Plaintiff's activities of daily living "exceed the doctor's conclusions. . . ."  (R. at 16.)

16

### c.  Adequate Reasons Were Given for Discounting Dr. Weaver's Opinions

Despite her vehement argument, Plaintiff has not shown any *specific*, reversible error in the ALJ's rejection of Dr. Weaver's conclusions.  First, Dr. Weaver merely checked a box on a form to give his opinion regarding Plaintiff's need to frequently be off task and to miss work.  Although the ALJ did not explicitly rely upon the "check a box" nature of Dr. Weaver's conclusions, the nature of those conclusions was a factor the ALJ was permitted to take into account.  *See, e.g., Kepke v. Comm'r of Soc. Sec.*, 636 Fed. App'x 625, 630 (6th Cir. 2016) ("Additionally, the ALJ found that Dr. Chapman's checklist opinion constituted weak medical evidence because of its conclusory nature. While checklist opinions are not *per se* unreliable in this context, it is not improper for an ALJ to take into consideration the format of a medical opinion, especially in light of other factors in the record that signal unreliability. The Court has held that an ALJ properly discounted a treating source's questionnaire because the source 'failed to provide any explanation for his responses.' *See Price v. Comm'r of Soc. Sec. Admin.,* 342 Fed. Appx. 172, 176 (6th Cir.2009).  Dr. Chapman's checklist opinion did not provide an explanation for his findings; therefore, the ALJ properly discounted it on these grounds.").  Second, and relatedly, Dr. Weaver did not explain why he believed Plaintiff would need to be absent or off task to those significant degrees, which the ALJ was likewise permitted to take into account.  *Id.*

Third, Plaintiff has not cited to any other evidence which supports Dr. Weaver's opinion.  On the other hand, as the ALJ noted, Plaintiff herself described activities of daily living which are inconsistent with Dr. Weaver's opinion.  For example, Plaintiff alternately described being able to walk one mile (R. at 234) or a couple of blocks.  (R. at 45.)  Plaintiff also related that she was able to cook, do routine household chores, shop for groceries, and care for/walk her dog.  An ALJ is entitled to take a claimant's activities of daily living into account in determining the amount of weight to afford a treating source's opinion.  *Hill v. Comm'r of Soc. Sec.*, 560 Fed. App'x 547, 550 (6th Cir. 2014) ("Finally, the ALJ observed that Malla's opinion was inconsistent with Hill's own statements about her daily activities, which included housekeeping and caring for her five-year-old daughter as a single mother. Thus, the ALJ gave adequate reasons for rejecting Malla's opinion.") (citation omitted).

Moreover, giving full credence to Dr. Weaver's opinion would have essentially led to a conclusion that Plaintiff could not engage in work (i.e., was disabled).[11]  However, in an opinion to which the ALJ afforded great weight, Dr. Parish concluded that Plaintiff could perform sedentary work.  (R. at 79.)  Similarly, James Tripp, Ed. D., concluded that Plaintiff could perform "simple,

---

[11] At the hearing, the VE testified that there would be no jobs available at any exertional level for a person who needed to be off task over twenty percent of a normal workday.  (R. at 59-60.)

unskilled work and interact with others adequately." (R. at 92) (capitalization standardized). Plaintiff fails to challenge specifically the weight given to either of those opinions, other than to argue generally in another section of her brief that the opinions are not accurately reflected in the ALJ's RFC findings. (DE 19 at 15-16.) In addition, in the paragraph immediately preceding his discussion of Dr. Weaver's opinion, the ALJ correctly noted that Plaintiff has "not had any complications since the [ICD] implantation." (R. at 16.) In short, Dr. Weaver's opinion regarding Plaintiff's need to be absent and off task is contrary to/not supported by other evidence of record.[12]

Granted, the ALJ's opinion does not discuss all of the factors an ALJ should consider when assigning the weight given to a treating source's opinion. However, a factor by factor analysis is not required. *Francis v. Comm'r of Soc. Sec.*, 414 Fed. App'x 802, 804 (6th Cir. 2011) ("Francis complains that the ALJ neglected two 20 C.F.R. § 404.1527(d)(2) factors in weighing Dr. Wakham's opinion . . . . Although the regulations instruct an ALJ to consider these factors, they expressly require only that the ALJ's decision include 'good reasons ... for the weight ...

---

[12] Plaintiff is also incorrect when she argues that "[t]he ALJ gives 'some weight' to the part of Dr. Weaver's medical opinion to the extent it agrees with sedentary work, however, none of Dr. Weaver's medical opinion is consistent with sedentary work." (DE 19 at 11.) To the contrary, Dr. Weaver's exertional limitations, such as Plaintiff only occasionally being permitted to lift ten pounds and being able to sit for six hours out of a typical eight-hour workday, are roughly consistent with the definition of sedentary work found in 20 C.F.R. §404.1567(a).

give[n] [to the] treating source's opinion'—not an exhaustive factor-by-factor analysis.").

In short, after fully reviewing the ALJ's opinion and the record, it is clear to this reviewer why the ALJ did not give controlling weight to Dr. Weaver's opinion.[13] Because the ALJ's opinion is supported by substantial evidence, it should be left undisturbed—even if the Court, perhaps, could have decided the matter differently. *Francis*, 414 Fed. App'x at 805 ("When substantial evidence supports an ALJ's decision, we affirm even if we would have decided differently, and even if substantial evidence also supports the opposite conclusion . . . .") (quotation marks and citations omitted).[14]

---

[13]Plaintiff's undeveloped argument that the ALJ should have re-contacted Dr. Weaver is incorrect. An ALJ has a duty to re-contact a treating source "only when the information received is inadequate to reach a determination on claimant's disability status, not where, as here, the ALJ rejects the limitations recommended by that physician." *Poe v. Comm'r of Soc. Sec.*, 342 Fed. App'x 149, 156 n.3 (6th Cir. 2009). Plaintiff can hardly argue, on the one hand, that Dr. Weaver's opinion was solid enough to take to the bank, while arguing that, on the other hand, it was so inadequate and lacking in specificity as to require that he be re-contacted.

[14] Finally, although the argument more logically fits in the RFC argument, *infra*, Plaintiff asserts within her treating source argument that the ALJ failed to discuss whether she is "capable of a competitive work schedule i.e., 8 hour day, 40 hour work week [as] . . . is required by SSR 96-8p . . . ." (DE 19 at 13.) However, such a finding is generally deemed to be encompassed implicitly by an ALJ's RFC finding. *See, e.g., Trischler v. Comm'r of Soc. Sec.*, 2015 WL 5016600, at *20 (E.D. Mich. Aug. 24, 2015) (Borman, J., adopting the report and recommendation of Morris, M.J.) (holding that "the RFC implicitly encompasses this [ability to perform work on a regular basis] finding" and consequently "[m]ost courts do not require any discussion.").

## 2.   The ALJ's RFC Determination

Plaintiff asserts that the ALJ's RFC determination did not accurately reflect her physical and mental impairments.  A plaintiff's RFC is "the most [he or she] can still do despite the physical and mental limitations resulting from [his or] her impairments."  *Poe*, 342 Fed. App'x at 155; s*ee also* 20 C.F.R. §§ 404.1545(a), 416.945(a).  The determination of Plaintiff's RFC is an issue reserved to the Commissioner and must be supported by substantial evidence.  20 C.F.R. §§ 404.1527(3), 416.927(e).  "'ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.'"  *Simpson v. Comm'r of Soc. Sec.*, 344 Fed. App'x 181, 194 (6th Cir. 2009) (quoting *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996)).

Pursuant to SSR 96-8p an RFC assessment must include:

> [A] narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).   In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

SSR 96-8p, 1996 WL 374184, at *6-7 (July 2, 1996). "Although SSR 96–8p requires a 'function-by-function evaluation' to determine a claimant's RFC, case

law does not require the ALJ to discuss those capacities for which no limitation is alleged." *Delgado v. Comm'r of Soc. Sec.*, 30 Fed. App'x 542, 547 (6th Cir. 2002). Instead, the ALJ "'need only articulate how the evidence in the record supports the RFC determination, discuss the claimant's ability to perform sustained work-related activities, and explain the resolution of any inconsistencies in the record.'" *Id.* (quoting *Bencivengo v. Comm'r of Soc. Sec.,* No. 00–1995, 251 F.3d 153, slip op. at 5 (3d Cir. Dec. 19, 2000)).

### a. Maximum RFC

Plaintiff asserts the ALJ "never considers" her "maximum RFC . . . ." (DE 19 at 14.)  The precise contours of Plaintiff's argument are difficult to discern with precision.  As the Court construes it, Plaintiff is essentially arguing that the ALJ's RFC determination does not take into account all of her severe impairments.

As the Commissioner notes, this Court has already rejected the same basic argument propounded by Plaintiff.  Specifically, in *Yang v. Comm'r of Soc. Sec.,* 2004 WL 1765480, at *4-5 (E.D. Mich. July 14, 2004) Judge Lawson held as follows:

> The plaintiff argues in essence that if a limitation is found to be severe at step two of the sequential analysis, then that severe impairment should be taken into account by limiting the jobs that the plaintiff could perform. Based on that inconsistency, the plaintiff suggests that the list of jobs that the vocational expert stated the plaintiff could perform conflicts with the description of such jobs contained in the Dictionary of Occupational Titles.

The Court believes, however, that conflating the step-two analysis with the RFC determination distorts the meaning and purpose of both. In this Circuit, the step-two burden of establishing a "severe" impairment has been characterized as "*de minimis.*" *See Higgs v. Bowen,* 880 F.2d 860, 862 (6th Cir.1988); *Murphy v. Sec'y of Health & Human Servs.,* 801 F.2d 182, 185 (6th Cir.1986). The Commissioner states that an impairment is "not severe if it does not significantly limit [a claimant's] physical or mental ability to do basic work activities, [such as] walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling ... [u]nderstanding, carrying out, and remembering simple instructions, [and][u]se of judgment." 20 C.F.R. § 404.1521. Thus, in *Salmi v. Secretary of Health and Human Services,* 774 F.2d 685 (6th Cir.1985), the Court of Appeals held that an impairment qualifies as "non-severe" only if it "would not affect the claimant's ability to work," regardless of the claimant's age, education, or prior work experience. *Id.* at 691-92. The prevailing view, then, is that only slight abnormalities that minimally affect a claimant's ability to work can be considered non-severe. *Higgs,* 880 F.2d at 862; *Farris v. Sec'y of Health & Human Servs.,* 773 F.2d 85, 90 (6th Cir.1985). Therefore, the application of the requirement to establish "severity" is quite "lenient," and generally it is "employed as an administrative convenience to screen out claims that are 'totally groundless' solely from a medical standpoint." *Higgs,* 880 F.2d at 862-63.

Residual functional capacity, on the other hand, is an "assessment of [the claimant's] remaining capacity for work," once his limitations have been considered. 20 C.F.R. § 416.945(a). It is meant "to describe the claimant's residual abilities or what the claimant can do, not what maladies a claimant suffers from-though the maladies will certainly inform the ALJ's conclusion about the claimant's abilities." *Howard v. Comm'r of Soc. Sec.,* 276 F.3d 235, 240 (6th Cir.2002).

A claimant's severe impairment may or may not affect his or her functional capacity to do work. One does not necessarily establish the other.

*See also Roberts v. Comm'r of Soc. Sec.,* 2015 WL 5439707, at *13 (E.D. Mich. June 9, 2015) (Patti, M.J.), *report and recommendation adopted at* 2015 WL 5439725 (E.D. Mich**.** Sept. 15, 2015) (Rosen, C.J.).[15]

### b.  Obesity

Plaintiff next argues that "[t]he ALJ never mentions SSR 02-1p *or does any analysis* with regard to obesity . . . ." (DE 19 at 14) (emphasis added).[16]   To the contrary, the ALJ found obesity to be among Plaintiff's severe impairments and he expressly accounted for that impairment in his RFC determination by stating that "[t]he claimant's obesity combined with her heart condition, though stable, and [sic] produces limitations that relegate her to the sedentary level of exertion." (R. at 13, 16.)  Moreover, though the ALJ did not discuss SSR 02-1p, he satisfied its requirements by relying upon the opinion of Dr. Parish, who recognized Plaintiff's obesity yet concluded she could perform sedentary work. *Coldiron v. Comm'r of*

---

[15] Plaintiff's attorney was also counsel for Plaintiff in *Roberts*.

[16] Plaintiff's counsel likes to pepper his briefs with the word "never" when pointing to the ALJ's alleged deficiencies; however, as pointed out in previous reports, this dramatic phraseology is often belied by the words of the ALJ's actual opinion. *See, e.g., Lapprich v. Comm'r of Soc. Sec.*, Case No. 2:15-cv-13290-AC-APP, DE 19 (July 18, 2016 report and recommendation) (Patti, M.J.) ("Plaintiff's counsel is cautioned that the use of emphatic but inaccurate statements—such as his repeated use of words and phrases like 'never,' 'makes no attempt,' and 'did not' (DE 16 at 14, 15, & 16)—to describe the ALJ's analysis seriously detracts from the credibility of his arguments and does not exhibit the candor toward the tribunal expected by this Court."), *report and recommendation adopted in part at* 2016 WL 4204133 (E.D. Mich. Aug. 10, 2016) (Cohn, J.).

*Soc. Sec.*, 391 Fed. App'x 435, 443 (6th Cir. 2010) ("Contrary to Coldiron's argument, the Sixth Circuit declared it a mischaracterization to suggest that Social Security Ruling 02–1p offers any particular procedural mode of analysis for obese disability claimants. Instead, SSR 02–1p provides that obesity, in combination with other impairments, may increase the severity of the other limitations. . . . Given the ALJ's discussion of Coldiron's obesity throughout his findings of fact and the ALJ's use of RFCs from physicians who explicitly considered Coldiron's obesity, we find that the ALJ adequately accounted for the effect that obesity has on Coldiron's ability to perform sedentary work.") (quotation marks and citation omitted).

Furthermore, Plaintiff has not met her burden to show how her obesity, alone or combined with other impairments, rendered her incapable of performing sedentary work.  *See, e.g., Smith v. Astrue*, 639 F.Supp.2d 836, 846-47 (W.D. Mich. 2009) (holding that SSR 02-1p "does nothing to relieve Smith of the burden of marshaling competent medical opinion and evidence to show *specifically* how her obesity exacerbated her other impairments, or interacted with them, to render her incapable of all suitable work. In the context of judicial review of the ALJ's decision, Smith had the burden of showing specifically how the obesity, in combination with other impairments, limited her ability to a degree inconsistent with the ALJ's RFC determination. Smith's objections fail to point to evidence and argument, submitted to the ALJ, by which she met that burden.").

Finally, the Court is disturbed by counsel's utterly baseless argument that the ALJ completely failed to mention Plaintiff's obesity. Counsel has previously been warned by this Court that sanctions may be appropriate for making damning allegations which are belied by the record. In *Roberts*, 2015 WL 5439725, at *2, then Chief Judge Rosen admonished Plaintiff's counsel in no uncertain terms for disturbingly similar behavior:

> Before leaving this matter, the Court feels compelled to note and comment upon a disturbing trend in the submissions of Plaintiff's counsel . . . . [C]ounsel recycles the very same sweeping and utterly unfounded charges in both briefs, falsely accusing the ALJs in these two cases of (i) failing to "give any rationale for [their] decision[s]," (ii) offering "no discussion of the objective medical evidence in the[ir] decision [s]" and "no discussion of the factual basis for the[ir] decision[s]," (iii) "cherry-pick[ing] the medical records instead of looking at the longitudinal treatment of" the two claimants, (iv) providing "no reasons whatsoever" for discounting the opinions of treating physicians, and (v) citing "no objective medical evidence" and eschewing "any analysis" in their RFC determinations. Even a cursory review of the ALJ decisions at issue reveals that they suffer from no such fundamental defects in their reasoning and evaluation of the medical record. Such hyperbole and generalized accusations of ALJ misfeasance are no substitute for engagement with the actual evidence in the administrative record and the explanations and analysis actually put forward by the ALJ. Counsel ill serves his clients by charging the ALJs with wholesale dereliction of their duties, rather than identifying specific findings by the ALJs that might lack evidentiary support or rest upon legally deficient reasoning.

(paragraph break and citation omitted).

### c.   Limitations in Social Functioning

Finally, Plaintiff argues "[t]here is no mention in the RFC of the ALJ's findings that Plaintiff has depression and moderate limitations in social functioning and concentration, persistence, or pace." (DE 19 at 15.) In his Paragraph B discussion regarding Plaintiff's mental impairments, the ALJ found that Plaintiff has moderate difficulties in her social functioning ability and concentration, pace and persistence ("CPP"). (R. at 14.) As the Commissioner notes, Plaintiff's social functioning argument improperly conflates those Paragraph B findings with the ALJ's RFC determination. *See* SSR 96-8p, 1996 WL 374184, *4 (July 2, 1996) ("The adjudicator must remember that the limitations identified in the 'paragraph B' and 'paragraph C' criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process."). Indeed, Plaintiff's argument to the contrary notwithstanding, the ALJ expressly found that Plaintiff's RFC reflected the limitations found in his Paragraph B findings. (R. at 15.) Moreover, the ALJ incorporated into his question to the VE a requirement that the hypothetical person could perform only simple, routine tasks (R. at 58), which satisfies the ALJ's duty to "in some way or form" incorporate the CPP limitations. *See, e.g., Mortzfield v. Comm'r of Soc. Sec.*, 2014 WL 1304991, at *1 (E.D. Mich. Mar. 31, 2014) (Tarnow, J.) ("In his hypothetical to the VE, the ALJ added the requirements that Plaintiff['s] . . . work would be limited to simple, routine, repetitive tasks to his assessment that Plaintiff

could perform sedentary work. The ALJ, therefore, satisfied the . . . requirement that the hypothetical to the VE 'in some way or form' incorporate Plaintiff's CPP limitation.").

Plaintiff has not pointed to specific evidence showing that her mental impairments necessitated additional limitations.  In fact, the ALJ's conclusion that Plaintiff could perform simple, repetitive work is in agreement with Dr. Trippi's conclusions.  (R. at 92) ("The claimant is able to perform simple, unskilled work and interact with others adequately.").  Moreover, Plaintiff's description of her activities of daily living (cooking, cleaning, doing laundry, etc.) is also in general alignment with the ALJ's conclusion that she could perform simple and repetitive tasks.  The ALJ's conclusions are supported by substantial evidence and, consequently, should not be disturbed.  *Southworth v. Comm'r of Soc. Sec.*, 2013 WL 3388946, at *17 (E.D. Mich. July 8, 2013) ("At the end of his step-three analysis, the ALJ made clear that he intended his residual functional capacity assessment to fully account for his 'moderate' CPP finding at step three . . . . Restated, the ALJ believed that his 'moderate' CPP rating was fully accounted for by the limitations in his residual functional capacity assessment, e.g., 'simple, routine and repetitive tasks that require only simple decision making.' Plaintiff's claim-of-error therefore reduces to whether substantial evidence supports the ALJ's belief that, despite her 'moderate' problems in CPP, Plaintiff could still

perform simple, routine, repetitive tasks on a sustained basis.") (paragraph break omitted).

### 3.  Listing 4.02

Plaintiff's final main argument is that the ALJ "failed to properly evaluate Listing 4.02." (DE 19 at 17) (capitalization standardized).  In fact, Plaintiff correctly points out that she asked the ALJ to consider Listing 4.02 in her prehearing memorandum (R. at 249) and at the hearing (R. at 27), yet the ALJ did not discuss it in his opinion.

Perhaps better practice would have been for the ALJ to have discussed Listing 4.02.  However, the Court's task is not to determine whether the ALJ's opinion was perfect.  Instead, the Court considers whether the ALJ's failure to discuss Listing 4.02 is reversible error.  *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 Fed. App'x 426, 432 (6th Cir. 2014) ("The relevant Social Security regulations require the ALJ to find a claimant disabled if he meets a listing. Yet, neither the listings nor the Sixth Circuit require the ALJ to address every listing or to discuss listings that the applicant clearly does not meet.") (quotation marks and citations omitted). "The ALJ should discuss the relevant listing . . . where the record raises 'a substantial question as to whether [the claimant] could qualify as disabled' under a listing." *Id.* (quoting *Abbott v. Sullivan,* 905 F.2d 918, 925 (6th Cir.1990)).

The question, therefore, is whether Plaintiff has shown that there is a substantial question about whether she could *meet the requirements* of Listing 4.02, not whether she simply *raised the issue*.  To make that showing, Plaintiff "must do more than point to evidence on which the ALJ could have based his finding . . . ."  *Smith-Johnson*, 579 Fed. App'x at 432.  Instead, she "must point to specific evidence that demonstrates [s]he reasonably could meet or equal every requirement of the listing.  Absent such evidence, the ALJ does not commit reversible error by failing to evaluate a listing at Step Three."  *Id.* at 432-33 (citations omitted).

Listing 4.02 is as follows:

4.02 Chronic heart failure while on a regimen of prescribed treatment, with symptoms and signs described in 4.00D2. The required level of severity for this impairment is met when the requirements in both A and B are satisfied.
A. Medically documented presence of one of the following:
1. Systolic failure (see 4.00D1a(i)), with left ventricular end diastolic dimensions greater than 6.0 cm or ejection fraction of 30 percent or less during a period of stability (not during an episode of acute heart failure); or
2. Diastolic failure (see 4.00D1a(ii)), with left ventricular posterior wall plus septal thickness totaling 2.5 cm or greater on imaging, with an enlarged left atrium greater than or equal to 4.5 cm, with normal or elevated ejection fraction during a period of stability (not during an episode of acute heart failure);
**AND**
B. Resulting in one of the following:
1. Persistent symptoms of heart failure which very seriously limit the ability to independently initiate, sustain, or complete activities of daily living in an individual for whom an MC, preferably one experienced in the care of patients with cardiovascular disease, has concluded that

the performance of an exercise test would present a significant risk to the individual; or

2. Three or more separate episodes of acute congestive heart failure within a consecutive 12–month period (see 4.00A3e), with evidence of fluid retention (see 4.00D2b(ii)) from clinical and imaging assessments at the time of the episodes, requiring acute extended physician intervention such as hospitalization or emergency room treatment for 12 hours or more, separated by periods of stabilization (see 4.00D4c); or

3. Inability to perform on an exercise tolerance test at a workload equivalent to 5 METs or less due to:

a. Dyspnea, fatigue, palpitations, or chest discomfort; or

b. Three or more consecutive premature ventricular contractions (ventricular tachycardia), or increasing frequency of ventricular ectopy with at least 6 premature ventricular contractions per minute; or

c. Decrease of 10 mm Hg or more in systolic pressure below the baseline systolic blood pressure or the preceding systolic pressure measured during exercise (see 4.00D4d) due to left ventricular dysfunction, despite an increase in workload; or

d. Signs attributable to inadequate cerebral perfusion, such as ataxic gait or mental confusion.

20 C.F.R. § 404, Subpt. P, App. 1 (emphasis added).

There does not appear to be an issue that Plaintiff has satisfied Part A of Listing 4.02 due to her ejection fraction being lower than 30%. For example, in January 2012, Dr. Weaver reported that Plaintiff's ejection fraction had improved from 15% to 29% with therapy. (R. at 294.) In addition, Dr. Parish opined that Plaintiff satisfied Part A of Listing 4.02. (R. at 99) ("Although the claimant can meet the first part of the criteria for CHF listing 4.02A she can not [sic] meet the second part."). However, Plaintiff has not shown that she meets Part B.

Plaintiff asserts that "[t]he medical evidence clearly demonstrates a period over 12 months in which the claimant met listing 4.02." (DE 19 at 20.) Yet, as the Commissioner points out, Plaintiff does not point to specific evidence to buttress that statement, which is a fatal omission. *Jones v. Comm'r of Soc. Sec.*, 2013 WL 4748083, at *8 (N.D. Ohio Sept. 4, 2013) ("[I]t is not the Court's function to search the administrative record for evidence to support [Plaintiff's] 'argument' or find law supporting [his or] her claims. This Court does not conduct a de novo review in social security proceedings, and certainly cannot be expected to craft an argument on [Plaintiff's] behalf.") (quotation marks and citations omitted).

Even if the Court leniently examines the merits of the argument, notwithstanding the deficiencies in Plaintiff's motion, Plaintiff's argument still fails. First, Plaintiff has not shown that she can satisfy Listing 4.02(B)(1) because she has not shown that a physician concluded that performing an exercise test would place her in substantial risk. In addition, that subsection of Listing 4.02 cannot reasonably be satisfied because Plaintiff's activities of daily living were not very seriously limited. Indeed, though Plaintiff had an ICD implanted, she has not shown that she has "persistent symptoms of heart failure[,]" as required by subsection (B)(1).

Second, Plaintiff has not cited evidence—nor did the Court independently locate any such evidence in its review of the record-- that she had three or more

acute episodes of congestive heart failure.  Accordingly, Plaintiff has not shown

how she could satisfy Listing 4.02(B)(2).

Third, Plaintiff has not pointed to evidence that she cannot perform an

exercise test at a workload of 5 METs[17] or less, meaning she has not shown how

she satisfied Listing 4.02(B)(3).  The Court is cognizant that Dr. Weaver checked a

box on his evaluation indicting Plaintiff has "[e]xercise intolerance" but he did not

explain whether/how that designation precluded an exercise tolerance test at 5

METs or less.  (R. at 733.)  Other areas of the record demonstrate that Plaintiff is

not totally incapable of performing exercise.  For example, she discussed an

exercise regimen with her mental health provider in August 2012 (R. at 467) and

Ahmad Zeibo, M.D., of the Henry Ford, Wyandotte Hospital noted in a discharge

summary dated June 14, 2013 that Plaintiff should "[w]alk 20 minutes daily if you

can."  (R. at 639-640.)  Finally, in August 2013 Plaintiff told her mental health

provider that she had been benefitting from "slight moderate exercise" and had

been encouraged to exercise in the past by her cardiologist (presumably Dr.

Weaver).  (R. at 554.)  In short, Plaintiff has not pointed to evidence indicating that

---

[17] MET is defined as "a unit of measure of the rate at which the body expends energy that is based on the energy expenditure while sitting at rest and is equal to 3.5 milliliters of oxygen per kilogram of body weight per minute—called also *metabolic equivalent*[.]"  http://www.merriam-webster.com/dictionary/met#medicalDictionary (last visited November 8, 2016).

she was totally exercise intolerant such that it could reasonably be inferred that she could not perform an exercise tolerance test as discussed in Listing 4.02(B)(3).

Finally, though he did not explain why he reached that conclusion, Dr. Parish opined that Plaintiff could not meet Part B of Listing 4.02.  (R. at 99).  The record as a whole, therefore, does not demonstrate that there is a substantial question as to whether Plaintiff could satisfy all of the requirements of Listing 4.02.  Consequently, the ALJ's failure to discussing Listing 4.02 is, at most, harmless error.

### G.   CONCLUSION

In sum, from a review of the record as a whole, the Undersigned concludes that substantial evidence supports the ALJ's decision denying benefits. Accordingly, it is **RECOMMENDED** that the Court **DENY** Plaintiff's motion for summary judgment (DE 19), **GRANT** Defendant's motion for summary judgment (DE 20), and **AFFIRM** the Commissioner of Social Security's decision.

### III.    PROCEDURE ON OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health &*

*Human Servs.*, 932 F.2d 505 (6th Cir. 1991).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health & Human Servs.*, 932 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1273 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No. 2," *etc.*  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," *etc.*  If the Court determines that any objections are without merit, it may rule without awaiting the response.

Dated: November 17, 2016          s/Anthony P. Patti_____
                                  Anthony P. Patti
                                  UNITED STATES MAGISTRATE JUDGE

I hereby certify that a copy of the foregoing document was sent to parties of record on November 17, 2016, electronically and/or by U.S. Mail.

s/Michael Williams
Case Manager for the
Honorable Anthony P. Patti